# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01377-COA

ANDREW GIBSON                                                                 APPELLANT

v.

ASHLEY GIBSON                                                                  APPELLEE

DATE OF JUDGMENT:            11/24/2020
TRIAL JUDGE:                HON. MARGARET ALFONSO
COURT FROM WHICH APPEALED:  HARRISON COUNTY CHANCERY COURT,
                            FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:     CAROLYN ANN McALISTER
ATTORNEY FOR APPELLEE:      ASHLEY GIBSON (PRO SE)
NATURE OF THE CASE:         CIVIL - DOMESTIC RELATIONS
DISPOSITION:                AFFIRMED - 01/04/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.

### BARNES, C.J., FOR THE COURT:

¶1.     Ashley and Andrew Gibson were married on August 28, 2011, and separated on or about June 2, 2014. They had one minor child born of the marriage, "James," born in 2011.[1] On September 29, 2015, Ashley filed a complaint in the Harrison County Chancery Court, seeking a divorce on the ground of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. She sought full legal and physical custody of the child, as well as child support. An agreed temporary order was entered on December 8, 2015, giving Ashley temporary custody and setting forth supervised visitation between

---

[1] A pseudonym has been used to protect the minor child's identity.

Andrew and James. Because Andrew was seeking treatment at the Heartland Rehabilitation Facility in LaBelle, Missouri,[2] his visitation was to occur while he was home during Christmas of 2015, and the visitation was to be supervised by his sister, Marilyn Whitehead. The chancery court also ordered Andrew to pay $50 in weekly child support.

¶2. On December 30, 2015, Andrew filed an answer and counterclaim seeking, in part, primary physical custody of James. In spring of 2016, Ashley, a caregiver and housekeeper, was arrested and charged with two counts of grand larceny for allegedly stealing from her employers. On May 4, 2016, Andrew—newly released from the rehabilitation facility—filed a petition seeking ex parte emergency custody of James on May 4, 2016. The petition noted Ashley's recent arrest and also alleged that Ashley had been using drugs and "living with a member of the opposite sex." The petition also claimed that Ashley had threatened to abscond with the child. By order signed on May 4, 2016, the former chancellor over the proceedings, Judge Sandy Steckler, gave temporary custody of James to Ethel Gibson, Andrew's mother and James's paternal grandmother. The court's order denied Ashley any visitation and contained a restraining order against her.

¶3. Ashley filed a motion to set aside the order, denying the allegations of drug use, living with another man, and any threats to abscond with James. A hearing on the motion was held on May 6. The court set aside its prior order, noting that it contained errors. The court also determined there was no reason "why [Ashley] shouldn't have unfettered visitation with the child."

---

[2] Andrew had two DUIs—one in 2012 and one in 2014. For the second one, he was incarcerated for six months and then released to the rehabilitation facility.

¶4. Andrew testified at the June 14, 2016 hearing that Ashley had been "addicted" to hydrocodone during their relationship. However, he had no personal knowledge whether she still continued to take any prescription medication; he also admitted that any threats Ashley made about absconding with James were made more than eighteen months prior to the current proceedings. Andrew testified that during his time at the rehabilitation facility, he had been given updates as to the child's doctor's visits and school progress. Andrew said Ashley had agreed to put the child on ADHD medication, even though he had been against doing so.

¶5. Ashley testified that she had her own residence and, despite accusations otherwise, did not reside with her boyfriend, Ben Bosarge. She currently worked for Ben's mother, taking care of her home and pets. Ashley also cared for Ben's three children (for whom he has physical custody) while Ben was at work. Ashley admitted that she had taken hydrocodone and Lortab prescribed to her after an automobile accident. But she said she went to an outpatient clinic in 2015 "to get[] rid of all that" and denied taking more than what was prescribed. She further alleged that Andrew had taken some of her medicine without telling her. Ashley expressed appreciation for the help that Ethel and Marilyn had given her while Andrew was in treatment. She also agreed that James "needs his daddy" and hoped they could work together in scheduling visits with Andrew. When asked by the chancellor about the pending felony charges against her, Ashley said she was advised by her defense attorney to plead the Fifth Amendment.

¶6. Roscoe Phillips, Ashley's father, testified that he and his wife were able to help take

3

care of James. Although Andrew had claimed Roscoe had an alcohol problem, Roscoe denied this accusation, saying that he holds a commercial driver's license and quit drinking years ago. Ethel, Andrew's mother, also testified that she had no medical issues that would prevent her from taking care of the child. She expressed concern that Ashley's moving to different places over the last two years did not provide a stable home for James. Marilyn, Andrew's sister, testified that she had kept the child for approximately ninety days during 2015 and approximately thirty days in 2016, primarily on the weekends.

¶7. On May 20, 2016, the chancery court entered another temporary order, vacating the prior order and (again) placing James in Ethel's custody. Ashley was awarded visitation on alternating weekends and weekly telephonic visitation. Because Andrew resided with Ethel, the order did not address Andrew's visitation. On November 16, 2016, the chancery court entered a new temporary order nunc pro tunc to May 20, 2016, awarding Ashley and Andrew alternating weekend visitation, daily telephonic visitation, and one weekday visit. The court also ordered them to pay Ethel child support and to select a guardian ad litem (GAL).

¶8. After issues finding an available GAL, the chancery court eventually appointed Vonder Bruegge as the GAL on January 27, 2017. On June 15, 2017, the court entered an agreed temporary order nunc pro tunc to May 20, 2017, awarding Ashley three weeks of summer visitation with James and both parents access to the child's doctor's appointments.

¶9. On July 10, 2018, Andrew filed an amended answer and counterclaim following Ashley's guilty plea, sentencing, and incarceration on two felony counts of grand larceny. Following a hearing, the chancery court entered a temporary order on October 17, 2018, nunc

4

pro tunc to March 12, 2018. Because Andrew had recently been arrested for another DUI, the order suspended Andrew's overnight visitation. The temporary order also assessed Andrew $1,114 in child-support arrearage.

¶10. Ethel, Marilyn, and Marilyn's husband, William Whitehead, (the movants) filed a motion seeking permanent guardianship of James. Andrew responded on February 7, 2019, opposing the motion and asserting a counterclaim of contempt for interfering with his relationship with the child. In her February 26 response, Ashley conditionally agreed that James should remain in the movants' care. Following a conference between counsel and the GAL, the court entered an order on May 14, 2019, which noted that James had been under the Whiteheads' care for almost three years and that Ashley was expected to remain incarcerated until October 2019.[3] The court denied Ashley's request to name additional guardians. Andrew was awarded unsupervised visitation on Sundays for three hours and was encouraged to participate in the child's therapy and to cooperate with the GAL's investigation.

¶11. On October 14, 2019, Andrew filed a motion for substitution of the GAL, claiming that the GAL "had not performed a home study" for Andrew and that he had "not been able to make contact with the [GAL]." The movants joined Andrew's motion, noting the GAL had "apparently closed his law practice." The chancery court entered an order on November 20, 2019, relieving the GAL from his duties. However, the court determined that no new GAL would be appointed. The order also modified visitation between James and his parents.

---

[3] It is noted in the record that Ashley was incarcerated from September 2017 to September 2019.

Specifically, upon her release from incarceration, Ashley would receive alternating Sunday afternoons. Andrew was awarded alternating weekends from Saturday morning to Sunday morning. The matter was set for trial.

¶12. On May 28, 2020, the parties consented to a divorce on the ground of irreconcilable differences, and the court entered a final judgment approving the "written property settlement agreement," which waived any claim to alimony or support. No change was made to guardianship or custody in the order.

¶13. A trial was held on September 10, 2020, and October 26, 2020, before a new chancellor, Judge Margaret Alfonso. Ashley's probation officer testified that Ashley was no longer incarcerated and that she had "gone over and beyond to meet the requirements and conditions of her parole" and was "an ideal probationer." The probation officer also said Ashley would likely complete her parole by the end of the following year.

¶14. Marilyn, Andrew's sister, testified that the child had been living with her and her husband since May 2016. She said James has ADHD and was "on the spectrum," albeit "highly functional." James sees a psychiatrist every four to six weeks. Marilyn said that Ashley had regularly attended the appointments with her since being released from custody; Andrew had only gone a couple of times. James, now nine years old, attends public elementary school and is in "gifted" classes. But Marilyn expressed that he needs "somebody that can be involved in school [and] . . . that can stay on top of things[.]"

¶15. Marilyn stated that Andrew's visitation with the child had been "sporadic," as he had gotten another DUI in 2017 and gone to work out of town for six to seven weeks at a time.

6

She also expressed concern about Andrew's prior felonies from over ten years ago for possession with intent and aggravated assault. Marilyn said Andrew had a business that sold a drug, Kratom, which she explained "is a drug that has a lot of the same effects as opiates[.]" Although she had not been to either parent's home, Marilyn said that Ashley had since married Ben Bosarge and that their family was nice. She also said Ashley had been attending church regularly with them; Andrew attends another church. Marilyn acknowledged that Ashley had come over "a couple of days a week" to help James with homework when school was closed due to COVID and had been involved with James's Boy Scout troop. Marilyn opined that Ashley should have custody, particularly noting that the mother "act[ed] more responsible" after serving her prison term. She did admit on cross-examination that Ashley had not paid her any child support. Marilyn also said that James loves both parents and enjoys his visits with them.

¶16.    Ashley testified that she will be on probation for the next five years. Even while incarcerated, she kept in touch with Marilyn and made sure she "never missed a Christmas or birthday[.]" She also would record herself reading books and send those to James. Ashley noted that she had taken care of James until he was approximately five years old. Ashley now works as an executive assistant and has a family member experienced in special-needs children that can pick up James from school when she is at work. She admitted that she had been addicted to pain pills but she went through a recovery program during her incarceration.

¶17.    Ashley's husband, Ben, testified that he and Ashley had been seeing one another "[s]ince 2014." He has worked for a construction company for twenty years. Ben said

7

Ashley got "along quite well" with his ex-wife, but he has never had a conversation with Andrew. He admitted that he had DUIs approximately twenty years prior.

¶18. Andrew testified that he worked at the Kratom Shack and said that Kratom is simply "a plant that's akin to the coffee plant" and has "pain relieving effects." He said that his relationship with his sister, Marilyn, was "nonexistent," but agreed that James should still have a relationship with her.

¶19. The chancery court entered its final judgment of custody and support on November 24, 2020. Thoroughly analyzing the applicable *Albright* factors,[4] the court concluded that Ashley "should be awarded paramount physical custody of [James] subject to the visitation rights of Andrew." The court ordered the parties to work with the Whiteheads and James's therapist in helping the child transition to the new custody arrangement during the upcoming Christmas school break. Andrew was awarded visitation on the first, third, and fifth full weekends of the month; visitation for various holidays was also outlined.

¶20. Andrew alleges on appeal that the chancery court's determination of custody was erroneous on the bases of the GAL's failure to file a report and the court's failure to appoint a replacement GAL. Finding no error, we affirm.

---

[4] The *Albright* factors are: (1) the age, health, and sex of the child; (2) "continuity of care"; (3) "parenting skills"; (4) the parties' "willingness and capacity to provide primary child care"; (5) the parties' employment responsibilities; (6) the parties' "physical and mental health and age"; (7) the "emotional ties of parent and child"; (8) "moral fitness" of the parties; (9) "the home, school and community record of the child"; (10) the child's preference, if the child is at least twelve years old; (11) the stability of the home environment and employment of each party; and (12) any "other factors relevant to the parent-child relationship" or the child's best interest. *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). Andrew makes no challenge to any specific finding in the court's *Albright* analysis.

**STANDARD OF REVIEW**

¶21. A chancery court's finding will not be disturbed on appeal "when supported by substantial credible evidence unless the chancery court has abused its discretion, was manifestly wrong [or] clearly erroneous," or applied an erroneous legal standard. *Hackler v. Hackler*, 296 So. 3d 773, 776 (¶12) (Miss. Ct. App. 2020) (quoting *Forrest v. McCoy*, 941 So. 2d 889, 890 (¶7) (Miss. Ct. App. 2006)).

**DISCUSSION**

¶22. Andrew's first allegation of error concerns the GAL's failure to submit a written report. Ashley did not file an appellee's brief. Generally, the "failure of an appellee to file a brief is tantamount to confession of error and will be accepted as such unless the reviewing court can say with confidence, after considering the record and brief of [the] appealing party, that there was no error." *Rogillio v. Rogillio*, 101 So. 3d 150, 153 (¶12) (Miss. 2012) (quoting *Dethlefs v. Beau Maison Dev. Corp.*, 458 So. 2d 714, 717 (Miss. 1984)). "However, reversal is not automatic nor required." *Wade v. Wade*, 967 So. 2d 682, 683 (¶4) (Miss. Ct. App. 2007). "Where issues of child custody are involved, we are 'compelled to review the record,' notwithstanding the appellee's failure to file a brief." *Id*. at 683-84 (¶4) (quoting *Mosley v. Atterberry*, 819 So. 2d 1268, 1272 (¶17) (Miss. 2002)).

¶23. As noted, the chancery court appointed the GAL, Bruegge, in January 2017. The GAL was "ordered and directed to file a written report with the [c]ourt, which may include recommendations." In Andrew's February 7, 2019 response to the guardianship motion, he specifically requested that the GAL "perform a home study of his home" and "report to this

[c]ourt as to why custody should not be placed with him or, in the alternative, why he cannot have extended visitation[.]"

¶24. We note that this case does not involve allegations of abuse or neglect, which would require appointment of a GAL under Mississippi Code Annotated section 93-5-23 (Rev. 2018). Therefore, the GAL did not have any statutory duty to file a written report. *See* Miss. Code Ann. § 43-21-121 (Rev. 2015).

¶25. Although the GAL did not submit a written report or recommendation, the GAL did testify before the chancery court at the June 29, 2017 hearing. Further, at the March 12, 2018 hearing, counsel for Andrew acknowledged that Andrew had "not been forthcoming with a visit address for Mr. Vonder Bruegge, the GAL, to go to his home to make a home visit," but the address had been provided to the GAL just prior to that hearing. The GAL explained, "And, Judge, I could have probably found his address, but my whole thing is, he doesn't have the kid so why should I go hunt down where he lives. . . . So I didn't – *when he wouldn't cooperate*, I didn't try to track him down." (Emphasis added). The GAL had visited both Ethel's and Marilyn's homes and had met with the child. The chancellor admonished Andrew to work with the GAL and allow the GAL to visit Andrew's residence "to see if it's suitable." Although the GAL had been relieved of his duties at the time of trial, photographs of Andrew's home were introduced into evidence, as well as a parenting-class certificate. Andrew also admitted that the GAL had performed a home visit in October 2018.

¶26. The Mississippi Supreme Court has held:

> In Mississippi jurisprudence, the role of a [GAL] historically has not been limited to a particular set of responsibilities. In some cases, a [GAL] is

10

appointed as counsel for minor children or incompetents. . . . In others, a [GAL] may serve as an arm of the court—to investigate, find facts, and make an independent report to the court. The [GAL] may serve in a very limited purpose if the court finds such service necessary in the interest of justice. Furthermore, the [GAL's] role at trial may vary depending on the needs of the particular case. . . . In some cases, the [GAL] may be called to testify, and in others, the role may be more limited.

*S.G. v. D.C.*, 13 So. 3d 269, 280-81 (¶47) (Miss. 2009). In this instance, we find that the GAL's failure to submit a written report to the chancery court did not constitute reversible error.

¶27. Andrew also alleges that the court's decision not to appoint another GAL was an abuse of discretion and constituted a failure "to fully protect the interests of the child." We find no merit to this claim. A court's decision to appoint a GAL is discretionary in a custody proceeding unless there have been charges of abuse or neglect. *Kaiser v. Kaiser*, 281 So. 3d 1136, 1141 (¶18) (Miss. Ct. App. 2019). As discussed, there were no such accusations mandating the appointment of a GAL. This Court further held in *Kaiser* that because the appointment of the GAL in that case was "discretionary," the chancery court's decision to allow "the GAL to withdraw without submitting a final custody recommendation" did not constitute error. *Id.* at 1142 (¶21).

¶28. Accordingly, upon review of the record, we find no error and affirm the final judgment.

¶29. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. SMITH, J., NOT PARTICIPATING.**